## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APTIM CORP.,

                 :     Case No. 1:17-cv-05269

         Plaintiff,

                 :

      v.               :     **ECF Case**

                 :

ALLIED POWER MANAGEMENT, LLC,
BERNHARD CAPITAL PARTNERS    :     JURY TRIAL DEMANDED
MANAGEMENT LP, DEAN SACK,
VICTORIA BOYLE and JOHN DOES 1-10,   :     Judge Sara L. Ellis

                 :     Magistrate Judge M. David Weisman

         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
## A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION


SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
Patrick Fitzgerald
Eric J. Gorman
155 North Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 407-0700
E-mail: patrick.fitzgerald@skadden.com
        eric.gorman@skadden.com

*Counsel for Plaintiff Aptim Corp.*

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................2

    A.    The Company's Client Contracts, Employees and Treatment of
Confidential and Proprietary Information....................................................2

    B.    The Company's Employees Sign Agreements to Protect its Trade Secrets
and Confidential Information........................................................................4

    C.    Sudden and Mass Resignations of Senior Personnel Servicing Major
Client 1........................................................................................................7

    D.    The Company's Preliminary Investigation Uncovers Theft of Confidential
and Proprietary Information.........................................................................8

    E.    The Theft and Use of Confidential Information Harms the Company ...................9

ARGUMENT ........................................................................................................10

I. APTIM Is Likely to Succeed on the Merits.......................................................11

    A.    Violation of the Defend Trade Secrets Act...............................................11

    B.    Violation of the Computer Fraud and Abuse Act .................................14

    C.    Breach of Fiduciary Duty.........................................................................15

    D.    Aiding and Abetting Breach of Fiduciary Duty.......................................16

    E.    Tortious Interference with Business Relations and Tortious Interference
with Contract............................................................................................16

    F.    Civil Conspiracy .....................................................................................18

II. No Adequate Remedy at Law Exists and APTIM Will Suffer Irreparable Injury If the
Injunction is Not Granted..............................................................................19

III. The Balance of Interests Favors Injunctive Relief..............................................20

CONCLUSION.....................................................................................................22

**TABLE OF AUTHORITIES**

## CASES

*Adcock v. Brakegate, Ltd.*,
    645 N.E.2d 888 (Ill. 1994) ...................................................................................18

*Ali v. Shaw*,
    481 F.3d 942 (7th Cir. 2007) ..............................................................................17

*Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*,
    420 F. Supp. 2d 866 (N.D. Ill. 2006) .................................................................20

*Dowd & Dowd, Ltd. v. Gleason*,
    816 N.E.2d 754 (Ill. App. Ct. 2004) ..................................................................17

*Echo, Inc. v. Timberland Machines & Irrigation, Inc.*,
    661 F.3d 959 (7th Cir. 2011) ..............................................................................17

*Fidlar Technologies v. LPS Real Estate Data Sols., Inc.*,
    2013 WL 5973938 (C.D. Ill. Nov. 8, 2013)........................................................19

*Freed v. JPMorgan Chase Bank, N.A.*,
    2012 WL 6193964 (N.D. Ill. Dec. 12, 2012) .....................................................17

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S. of America, Inc.*,
    549 F.3d 1079 (7th Cir. 2008) ......................................................................20, 21

*Hefferman v. Bass*,
    467 F.3d 596 (7th Cir. 2006) ..............................................................................16

*Huawei Technologies Co. v. Motorola, Inc.*,
    Civil Action No. 11-cv-497, 2011 WL 612722 (N.D. Ill. Feb. 22, 2011) ..................20, 21

*IDS Life Insurance Co. v. SunAmerica, Inc.*,
    958 F. Supp 1258 (N.D. Ill. 1997),
    *aff'd in part, vacated in part on other grounds sub nom. IDS Life Insurance Co. v.*
    *SunAmerica Life Insurance Co.*, 136 F.3d 537 (7th Cir. 1995) .................................19, 22

*Illusions Too Reality, LLC v. City of Harvey*,
    2003 WL 260335 (N.D. Ill. Feb. 4, 2003) ........................................................10

*ISC-Bunker Ramo Corp. v. Altech, Inc.*,
    765 F. Supp. 1310 (N.D. Ill. 1990) ....................................................................21

*James v. Intercontinental Hotels Group Resources, Inc.*,
    2010 WL 529444 (N.D. Ill. Feb. 10, 2010) .......................................................17

*Lane v. Le Brocq*,
   No. 15 C 6177, 2016 WL 1271051 (N.D. Ill. Mar. 28, 2016) ..........................................14

*Lane v. Money Masters, Inc.*,
   No. 14-cv-1715, 2015 WL 225427 (N.D. Ill. Jan. 15, 2015).............................................18

*Michigan v. U.S. Army Corps of Eng'rs*,
   667 F.3d 765 (7th Cir. 2011) ...........................................................................................10

*Molon Motor & Coil Corp. v. Nidec Motor Corp.*,
   2017 WL 1954531 (N.D. Ill. May 11, 2017) .......................................................11, 13, 14

*Motorola, Inc. v. Lemko Corp.*,
   609 F. Supp. 2d 760 (N.D. Ill. 2009) ..........................................................................14, 15

*PepsiCo, Inc. v. Redmond*,
   No. 94 C 6838, 1995 U.S. Dist. Lexis 19437 (N.D. Ill. Jan. 26, 1995) ...........................19

*Qualey v. U.S. Metals, Inc.*,
   No. 08 C 2636, 2009 WL 972612 (N.D. Ill. Apr. 8, 2009)................................................15

*Roland Machinery Co. v. Dresser Industries, Inc.*,
   749 F.2d 380 (7th Cir. 1984) ...........................................................................................19

*Ty, Inc. v. Jones Group, Inc.*,
   237 F.3d 891 (7th Cir. 2001) ......................................................................................10, 11

**STATUTES**

18 U.S.C. § 1030(a)(2)..........................................................................................................14

18 U.S.C. § 1030(a)(4)..........................................................................................................14

18 U.S.C. § 1836(b)(1) ..........................................................................................................11

18 U.S.C. § 1839(3) ...............................................................................................................12

18 U.S.C. § 1839(5) ...............................................................................................................12

Plaintiff Aptim Corp. ("APTIM" or the "Company") hereby respectfully submits this Memorandum of Law in Support of its Motion for a Temporary Restraining Order and Preliminary Injunction against Defendants Allied Power Management, LLC ("Allied"), Dean Sack ("Sack") and Victoria Boyle ("Boyle").[1]

## INTRODUCTION

APTIM's former employees Dean Sack and Victoria Boyle stole the Company's confidential information, including a large file containing proprietary information about its employees, who serviced the Company's most important customer. They are now using this information to benefit their new employer, Defendant Allied. Allied is run by their former boss, Ron McCall, who holds this position in direct violation of a noncompete agreement he signed with the Company. Allied, Sack and Boyle are violating federal law, state law and contractual obligations by misappropriating and using the Company's confidential information to compete with the Company. They are now engaged in a campaign which also involves stealing more than a dozen employees from the Company in a two-week period in an effort to destabilize APTIM's relationship with its most significant clients. APTIM seeks injunctive relief against Allied, Sack and Boyle to bar their continued possession and use of the Company's confidential information.

The Company engages in tough but fair competition with other Bernhard Capital Partners, LLC ("BCP") affiliates in various industries on a regular basis. Here, however, Allied

---

[1]     Plaintiff Aptim Corp. is the successor in interest to the Capital Services operating segment of Chicago Bridge & Iron Company N.V. ("CB&I"), whose subsidiary The Shaw Group ("Shaw") was purchased by CB&I in 2013. Shaw was founded by James M. Bernhard, Jr. On June 30, 2017, APTIM acquired CB&I's Capital Services operating segment. As part of the acquisition, Shaw and CB&I assigned to APTIM rights that relate to APTIM's business, including the right to bring an action related to the unlawful conduct described herein, some of which predates the acquisition by APTIM. This Memorandum of Law therefore includes facts that took place before, during and after the sale of Shaw's businesses to CB&I and later again to APTIM. This Memorandum refers to the business segment that passed from Shaw to CB&I to APTIM as the "Company."

is wrongfully using improperly-obtained confidential information (the "Confidential Company Information") to harm the Company's key customer contracts, employee relationships and reputation in the industry. The theft and misuse of the Confidential Company Information appears part of a larger scheme by Allied and BCP to lay the groundwork for their plan to service at least two of APTIM's clients.

APTIM seeks emergency relief enjoining Defendants from possessing, accessing, reviewing or using any of the Confidential Company Information. Further, APTIM seeks an order requiring Defendants to submit to forensic examination any of the devices used in connection with the misappropriation. APTIM has a strong likelihood of success on the merits of its claims, money damages are inadequate to compensate the continued risk of misappropriation of Confidential Company Information by Defendants, and the balance of interests weighs decidedly in APTIM's favor.

## BACKGROUND[2]

### A. The Company's Client Contracts, Employees and Treatment of Confidential and Proprietary Information

The Company invests heavily in its client relationships and workforce. Recruiting, hiring and retaining talented employees is crucial for the Company's success. As such, the Company devotes significant resources to these efforts as well as in training its current employees. (Bethmann Decl. ¶ 6.)

Defendants are using the Company's confidential information about its workforce and its clients to attempt to take over at least two significant Company clients, including Major Client 1

---

[2] Facts summarized in this section are set forth in greater detail in the Declaration of Chris Bethmann, dated July 19, 2017 (the "Bethmann Decl.").

and Major Client 2. Approximately 1,400 employees of the Company provide services to Major Client 1, including approximately 25 at the senior management level and approximately 650 in administrative, professional, or supervisory capacities. More than 600 Company employees provide services to Major Client 2, which operates in the same industry as Major Client 1. These employees require highly-specialized training to maintain access to the work sites and perform their work safely and in compliance with relevant regulations. The employees are also required to be able to work at multiple sites. APTIM maintains the training of its employees to ensure that these employees can meet the demands of its clients. (*Id.* ¶¶ 5, 6, 11.)

Sack was the Company's Vice President in charge of the Major Client 1 account, and Boyle was the Senior Project Services Staffing Manager. The Company's employees servicing Major Client 1 worked within Major Client 1's facilities on a regular and ongoing basis. Pursuant to the Company's policy, many of the senior employees who supervised work at those facilities had access to, and used, Major Client 1's computers and email addresses. (*Id.* ¶¶ 7, 10.)

In Boyle's senior staffing role, she also serviced the account for Major Client 2. She was responsible for hiring and allocating human capital across multiple projects, including staffing for major maintenance projects and during outages (work stoppages) at the client's facilities. (*Id.* ¶ 12.)

Given the nature of its business, the Company maintains various types of confidential and proprietary information. This includes pricing information from clients, salary data regarding its employees and operation data from ongoing projects. The Company takes multiple measures to protect its confidential information. Among other things, the Company requires employees to sign confidentiality agreements or acknowledgements. The Company also takes multiple steps to protect its confidential information that is stored electronically and available online. In

addition, the systems that contain sensitive information regarding employees are only accessible to human resources, staffing team members and certain senior management members with a business need-to-know. (Bethmann Decl. ¶¶ 25-27.)

**B. The Company's Employees Sign Agreements to Protect its Trade Secrets and Confidential Information**

As part of the hiring and onboarding process for all new employees, the Company requires them to sign agreements that address the Company's policies regarding handling and maintaining confidential information. These documents have developed over time and are intended to protect the Company's interests in its trade secrets and confidential information. (*Id.* ¶ 13.)

**1. Ron McCall**

Ron McCall ("McCall") worked for the Company from 2002 until he left the Company in January 2016, by which time he was the President of the Company's Facilities and Plant Services business division. During his tenure, he supervised multiple business lines and thousands of employees, including the workforce assigned to the contract for Major Client 1. McCall executed an employment agreement with the Company, which included a nonsolicitation and noncompete agreement and non-disclosure obligations. (*Id.* ¶¶ 14-16.) Pursuant to the nonsolicitation and noncompete agreement, McCall is specifically restricted from soliciting or providing—whether directly or indirectly—to customers of the Company "engineering, construction, procurement, maintenance, Environmental, [or] pipe fabrication services." (Bethmann Decl. Ex. A.) McCall also agreed not to "directly or indirectly, at any time…, use or otherwise exploit Confidential Information to the detriment of the Company." (*Id.*) McCall's

nonsolicitation and noncompete agreement are in force until January 31, 2018, therefore his current employment as the CEO of Allied is in clear breach of this agreement.[3] (*Id.*)

## 2. Dean Sack

Sack began working for the Company on January 1, 2007. His most recent position with the Company was as Vice President, overseeing Major Client 1's account. In this role, Sack managed the client relationship, and he oversaw all of its sites. Sack had overall responsibility for the hundreds of employees within the fleet (i.e., the Company employees assigned to the client). Sack reported directly to McCall between June 2015 and January 2016 and indirectly at times before that. As part of Sack's hiring and continued employment at the Company, he signed a Confidentiality Agreement, an agreement entitled "Prohibited Use of Confidential Information," and a Trade Secrets and Patents Protection Agreement. (*See* Bethmann Decl. Exs. B, C, D.) Sack signed the Confidentiality Agreement on December 27, 2006. That agreement restricts Sack from disclosing confidential information as follows:

> Employee shall not disclose or use at any time, either during or subsequent to his employment by the Company, any trade secrets, proprietary technical information or other confidential information (including, without limitation, customer lists, company vision, strategy, methods, systems and procedures, marketing plans and strategies, and other information pertaining to the business of the Company that is not publicly available), whether patented or not, developed and/or owned by the Company or to which the Company has obtained rights by license or otherwise (the "Confidential Information").

(Bethmann Decl. Ex. B.) The agreement also contained a provision regarding the continuity of Sack's obligations after his employment:

---

[3]     McCall's employment agreement contains an arbitration provision. On July 17, 2017, the Company filed an arbitration demand with the American Arbitration Association ("AAA") against McCall alleging breach of the nonsolicitation and noncompete agreement and seeking specific performance, injunctive relief and damages. The arbitration proceeding is captioned *APTIM Corp. v. Dorsey Ron McCall*, AAA Case No. 01-17-0004-1782.

> Survival. This covenant against use of Confidential Information shall survive termination of the Employee's employment for any reason whatsoever . . . , and this covenant shall remain in effect and be enforceable against Employee for so long as such Confidential Information retains commercial value, in the Company's sole opinion. Upon termination of employment, Employee shall promptly deliver to the Company all materials relating to Confidential Information which are in possession of or under the control of Employee . . . .

(*Id.*) On December 26, 2006, Sack signed a Trade Secrets and Patents Protection Agreement.

That agreement, in relevant part, states as follows:

> Other than as required in my duties to my Employer, I shall not disclose to anyone or use either during or after my employment, except with written consent of my Employer, any trade secret or confidential technical or business information of my Employer. . . .

(Bethmann Decl. Ex. D.) Sack signed a Prohibited Use of Confidential Information agreement

on or about December 26, 2006. Under the agreement, Sack cannot use "the information and

material [he] obtained while working for [the Company] for any purpose other than [the

Company's] purpose." (Bethmann Decl. Ex. C.)

**3.    Victoria Boyle**

Boyle started working at the Company on June 12, 2006, as a staffing manager. Most

recently, she was the Senior Project Staffing Services Manager and worked on the accounts for

Major Client 1, Major Client 2 and one additional client. In that capacity, she had access to

extensive information regarding the Company's employees and its clients within those fleets.

Among other things, she was privy to information regarding employees' various positions within

the company, titles, compensation levels, salary history, performance reviews, home addresses,

telephone numbers and personal or work email addresses. Boyle signed a Confidentiality

Agreement on June 2, 2006. (Bethmann Decl. ¶¶ 23-24.) This agreement was identical to the

Confidentiality Agreement signed by Sack, including the same provisions on "Confidential

Information" and "Survival." (Bethmann Decl. Ex. E.)

**C.      Sudden and Mass Resignations of
          <u>Senior Personnel Servicing Major Client 1</u>**

In early June 2017, Sack and others began to contact Company employees who worked

on the account for Major Client 1, encouraging them to resign their positions and join an

emerging competitor of the Company.  (Bethmann Decl. ¶ 35.)  On Friday, June 2, 2017, Sack

contacted one of his fellow employees and asked him how quickly he could resign.  (Bethmann

Decl. Ex. G.)  During this conversation, Sack stated that he was "interested in destabilizing the

Company as quickly as possible."  (*Id.*)  The employee rebuffed Sack's request, but Sack

contacted him again over the course of the next two days.  (*Id.*)  The same day, without any

advance notice, Sack resigned from the Company effective immediately.  (*Id.*)

The same day that Sack resigned, he called two of his fellow employees both of whom

resigned the following Monday.  In total, seven employees resigned on Monday, June 5, 2017:

Boyle; Robert Nevin (Project Managing Director); Michael Less (Midwest Regional Director);

Thomas Dahl (Health, Safety, Environment Manager); John Janek (Site Manager); Graham

Cross (Mid-Atlantic/New England Regional Director); and Bruce Brown (Site Manager).  The

following morning, Tuesday, June 6, 2017, David Williams (Site Manager) submitted his

resignation.  The next day, June 7, 2017, two more employees resigned: Thomas Cardell (Site

Manager) and Jessica Lee (Project Manager).  By June 13, 2017, four more resignations

followed: Garry Evans (Site Manager); Michael Myers (Site Manager); Richard Minnick (Senior

Project Controls Specialist); and Robert Sumler (Project Specialist).  (Bethmann Decl. ¶¶ 37-42.)

Following the resignation of employees, the Company sent notices to each employee

reminding them of their obligation to maintain the confidentiality of the Company's information

and trade secrets.  (*See* Bethmann Decl. Ex. F.)

**D.    The Company's Review of Its Files Uncovers Defendants'
       Theft of Confidential and Proprietary Information**

**1.    Sack Takes Confidential Information and Solicits Employees**

The Company learned that Sack sent an Excel file with proprietary and confidential Company information from his Company email account to his private Hotmail email address on May 30, 2017, three days before his resignation.  Sack attached an Excel file, entitled "Copy of 2015 [Major Client 1] PIP 3 28 16 Final (JBB).xlsx" to the email.  The file contains a comprehensive overview of the Company's employees at all of Major Client 1's work sites.  Specifically, the Excel file includes a list of 78 of the most senior managers on the Major Client 1 account.  The report also contains detailed information about each employee, including their salary, "Target PIP" and a number of other employment metrics, as well as notes about specific individuals' performance levels.  The Excel file also includes information about over 1,500 of the Company's employees working for Major Client 1.  The list encompasses nearly 40 fields of information from each employee, including name, contact information, compensation, employee category, employment location, union member status, Medicare benefits and number of vacation days.  In total, the spreadsheet contains almost 60,000 cells of data.  (Bethmann Decl. ¶¶ 30-33.)

One of the Company's employees reported that he received about three calls a day, mostly from Sack, asking the employee to resign immediately, but the employee refused. (Bethmann Decl. Ex. G.)  The employee stated that Sack made it clear that Allied's management was taking note of his unwillingness to cooperate.  (*Id.*)  Sack contacted another employee on June 2, 2017.  (*Id.*)  On Tuesday, June 6, 2017, Sack called another employee, asking him to log on to alliedpwr.com in order to apply for a new job.  (*Id.*)

On about July 10, 2017, Mark Granger, Production Superintendent at a facility operated by Major Client 1, announced his resignation from the APTIM and his intention to join Allied.

8

Granger informed APTIM that Sack contacted him on or about July 6, 2017 about joining the Allied "transition team" as a traveling site manager or production superintendent during outages. He also met with Sack on Saturday, July 8, 2017.  Granger's final date of employment with APTIM was July 14, 2017.  (Bethmann Decl. ¶¶ 51-52.)

**2.      Boyle Takes Confidential Information and Solicits Employees**

On June 28, 2017, after Boyle resigned from the Company and was working at Allied, she sent a text to one of the Company's site leaders working on the account of Major Client 2 and referenced the exact amount of his current pay—to the penny.  The site leader's hourly rate is housed in the Company's Access database that contains confidential information about all of the Company's employees.  This includes employees on Major Client 1's account, Major Client 2's account and other accounts.  (*Id*. ¶ 34.)

**3.      Other Solicitation Efforts**

On Friday, June 2, 2017, the same day Sack resigned, Graham Cross (who resigned soon thereafter) contacted another of the Company's employees and said that he wanted the employee to come work for him again.  (Bethmann Decl. Ex. G.)  Later in the conversation, Cross told the employee he deserved the Site Manager role.  On June 7, 2017, an employee of the Company provided the Company with a redacted offer letter from Allied, signed by John Plumlee, the Chief Operating Officer of Allied.  (Bethmann Decl. Ex. H.)

**E.      The Theft and Use of Confidential Information Harms the Company**

Sack and Boyle's continued possession of this confidential information poses multiple threats to the Company.  A broader disclosure of this information than has already occurred would render it no longer confidential, which would be extremely damaging to the Company and to the individual employees whose personal information is contained within this data. (Bethmann Decl. ¶ 56.)

9

Additionally, by using this information on behalf of Allied, Defendants are causing the Company to incur significant losses of personnel. The Company has lost multiple high-level, talented employees. Over the years, the Company made significant investments of time and resources in these employees, including for training and professional development. (*Id.* ¶ 57.)

The Company's reputation within the industry (including with unions, potential customers and suppliers) also has suffered and will continue to suffer. The Company has a strong reputation for delivering high-quality services to its clients. Defendants' misconduct is undermining the Company's position as an industry leader. (*Id.* ¶ 58.)

This misconduct has harmed the Company by causing a loss of confidence in the Company from its existing customers. These relationships were established over the course of many years and with significant effort. As a result of Defendants' misconduct, the Company's hard-earned goodwill has suffered. (*Id.* ¶ 59.)

## ARGUMENT

A preliminary injunction is "a way to maintain the *status quo* until merits issues can be resolved at trial." *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 783 (7th Cir. 2011). The standards for granting a temporary restraining order and preliminary injunction are similar. *See Illusions Too Reality, LLC v. City of Harvey*, No. 02 C 7272, 2003 WL 260335, at *4 (N.D. Ill. Feb. 4, 2003). Injunctive relief is warranted where, as here, the movant can demonstrate: "(1) its case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). If those conditions are satisfied, the Court must then weigh the burden to be imposed on the nonmovant against the "irreparable harm the moving

party will suffer if relief is denied." *Id*. Finally, the Court must consider the public interest in granting or denying the relief. *See id*.

APTIM meets the standards for a temporary restraining order and a preliminary injunction.

## I.     APTIM IS LIKELY TO SUCCEED ON THE MERITS

APTIM seeks injunctive relief against Defendants based upon their violation of federal laws (the Defend Trade Secrets Act ("DTSA") and the Computer Fraud and Abuse Act ("CFAA")), contractual obligations and common law duties, and their possession and use of confidential and trade secret information belonging to APTIM. To satisfy the requirement that the claims have some likelihood of success on the merits, APTIM must only show that it has a "better than negligible" chance of succeeding on at least one of its claims. *Id*. at 898. Because Defendants' grave misconduct relates to highly confidential and sensitive information – some of which is known to be have been wrongfully accessed and removed from the Company's possession by Sack and Boyle and known to be in the possession of the Defendants – APTIM more than satisfies this burden.

### A.     Violation of the Defend Trade Secrets Act

With respect to its DTSA claim, APTIM must ultimately establish: (1) the existence of a trade secret; (2) that the trade secret was misappropriated; and (3) that such conduct relates to interstate commerce. *See, e.g.*, *Molon Motor & Coil Corp. v. Nidec Motor Corp.*, No. 16 C 03545, 2017 WL 1954531, at *3-7 (N.D. Ill. May 11, 2017); *see also* 18 U.S.C. § 1836(b)(1). The DTSA defines trade secrets broadly as:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including . . . compilations, . . . methods, techniques [among many others], whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically,

11

photographically, or in writing if—(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3). Trade secrets will be deemed "misappropriated" when, among other reasons, the following occurs:

> (A) acquisition of a trade secret of another by a person *who knows or has reason to know that the trade secret was acquired by improper means*; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . *derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret.*

18 U.S.C. § 1839(5) (emphases added). APTIM has the requisite likelihood of success of proving these elements.

The Confidential Company Information is a trade secret. The Excel file taken by Sack contained almost tens of thousands of cells of propriety and confidential information about APTIM's business, as well as its employees, including names, contact information, titles and compensation. (Bethmann Decl. ¶ 33.) This information, as well as the additional undetermined information taken by Boyle to solicit employees, is a trade secret under the DTSA because the records are financial, business and economic information in the form of compilations, including internal company methods and techniques. *See* 18 U.S.C. § 1839(3). This information, which is not generally known, derives its own economic value because, among other things, it is the very internal mechanism of a company in determining the value of its employees.

APTIM will be able to establish that each of the Defendants has misappropriated its trade secrets. Sack knew that he was not permitted to share Confidential Company Information outside of the Company and signed agreements to this effect. (*See* Bethmann Decl. ¶ 18.) Nonetheless, only three days before resigning without notice and leading a coup of departures,

Sack sent to his *private* e-mail account a message with no text and just the attached Excel file with confidential information. (*Id.* ¶ 30.) Thus, Sack acquired this trade secret by improper means. *See Molon*, 2017 WL 1954531, at *5 (finding that taking information from one's current employer to use at a competing company "readily meets the definition of acquiring trade secrets through 'improper means'").

Boyle has been using confidential information and trade secrets to solicit employees of the Company. Specifically, APTIM recently learned that Boyle contacted an employee of the Company in an effort to induce him to join Allied and stated his hourly compensation to the cent. (Bethmann Decl. ¶ 34.) This information is Confidential Company Information and Boyle only could have acquired this information while she was an employee of the Company, and therefore her current use of this information in connection with her employment at Allied is in clear violation of her confidentiality obligations to the Company. (*See id.* ¶ 24.)

APTIM will also establish such claims against Allied, showing that it acted in concert to receive this information, whether by an agency relationship between Allied, Boyle and Sack or the knowledge of Allied's CEO that the Company's employees are subject to confidentiality obligations. Evidence related to Allied's conduct is uniquely in the possession of Defendants. Further, this information also must have been inevitably disclosed to Allied. As a court in this district has explained:

> The "inevitable disclosure doctrine" allows a plaintiff to "prove a claim" of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets. In evaluating whether the facts justify this circumstantial-evidence inference, courts consider: "(1) the level of competition between the former employer and the new employer; (2) whether the employee's position with the new employer is comparable to the position he held with the former employer; and (3) the actions the new employer has taken to prevent the former employee from using or disclosing trade secrets of the former employer."

13

*Molon*, 2017 WL 1954531, at *5 (citations omitted). Here, there is clear competition between APTIM and Allied, as each render services to the same industry as APTIM's client and Allied is currently stealing APTIM's employees to compete in that space. Moreover, the various employees who resigned from the Company, including Sack and Boyle, presumably hold the same or similar roles at Allied as they did with the Company, making it likely that they would inevitably rely on the Confidential Company Information misappropriated by Sack, Boyle and potentially others. Evidence of what Allied employees other than Sack and Boyle knew or did is peculiarly within the Defendants' knowledge. As such, APTIM will be able to establish a claim under the DTSA against Allied, Sack and Boyle.

### B. Violation of the Computer Fraud and Abuse Act

APTIM is also likely to succeed on the merits of its claims under the CFAA. A person violates the CFAA if he or she "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value." 18 U.S.C. § 1030(a)(4). A plaintiff must prove the following elements: "(1) intentional access of a computer, (2) without or in excess of authorization, (3) whereby the defendant obtains information from the protected computer." *Motorola, Inc. v. Lemko Corp.*, 609 F. Supp. 2d 760, 766 (N.D. Ill. 2009); *see also* 18 U.S.C. § 1030(a)(2). Courts in this district have found that where an employee accesses a company computer to send confidential information to a competitor, that constitutes a violation of the CFAA. *See Lemko*, 609 F. Supp. 2d at 767 ("Allegations that an employee e-mailed and downloaded confidential information for an improper purpose are sufficient to state a claim [under the CFAA] that the employee exceeded her authorization."); *see also Lane v. LeBrocq*, No. 15 C 6177, 2016 WL 1271051, at *9 (N.D. Ill. Mar. 28, 2016) ("District courts in this

Circuit have routinely . . . permit[ted] a claim under the CFAA against a disloyal employee who uses an employer's computer for his own purposes.").

Here, Sack violated the CFAA when he accessed Confidential Company Information and transferred it outside of the Company via email without any authorization.  (*See* Bethmann Decl. ¶ 30.)  APTIM will be able to establish that Allied violated the CFAA, under which a defendant company is liable for the actions of its employees.  *See Lemko*, 609 F. Supp. 2d at 770 (finding employer liable where employees acted on its behalf and at its request).  APTIM intends to establish that Sack was acting on behalf, or at the behest, of his current employer, Allied, and Allied received the Confidential Company Information as a result of that relationship.

Lastly, APTIM will be able to establish that it has suffered the requisite $5,000 of loss and damages as a result of these actions; the Company has undergone a very significant and time-consuming forensic review of its systems and data, among having taken other related steps. (*See* Bethmann Decl. ¶ 61.)

### C.  Breach of Fiduciary Duty

It is well-settled under Illinois law that an employee owes a "duty of fidelity and loyalty to his employer."  *Qualey v. U.S. Metals, Inc.*, No. 08 C 2636, 2009 WL 972612, at *2 (N.D. Ill. Apr. 8, 2009) (internal citations omitted).  An employee cannot breach that trust by "soliciting his employer's customers for himself, or enticing coworkers away from his employer."  *Id.*

The fact that fifteen employees resigned on short or no notice from a highly-reputable, international company to work for a start-up, with no employees and no contracts, strongly suggests that any solicitation efforts began before Sack's resignation.  Sack's phone records support this conclusion.  (*See* Bethmann Decl. ¶ 37.)  As such, APTIM will be able to establish that Sack breached his fiduciary duties by soliciting employees while still employed by the Company.  Similarly, Sack and Boyle breached their fiduciary obligations when they used

15

information belonging to the Company against it, in clear violation of confidentiality agreements with the Company. (*See id.* ¶¶ 34, 48-52.)

### D.    Aiding and Abetting Breach of Fiduciary Duty

APTIM likewise has a basis to establish that Allied aided and abetted Sack's and Boyle's breaches of their fiduciary duties. To state a claim for aiding and abetting under Illinois law, "one must allege (1) the party whom the defendant aids performed a wrongful act causing an injury, (2) the defendant was aware of his role when he provided the assistance, and (3) the defendant knowingly and substantially assisted the violation." *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006). Here, although evidence that Allied knew Sack and Boyle had taken Confidential Company Information and used it to solicit the Company's employees and clients is peculiarly in Allied's possession, the circumstances point to Sack and Boyle acting in concert with Allied and Allied having knowledge of their conduct. Recruiting such employees is an integral part of building Allied's business from the ground up, and Allied sent letters to the Company's employees. (*See* Bethmann Decl. ¶ 46.) By ratifying this conduct, Allied aided and abetted Sack's and Boyle's breaches of their fiduciary duties. In addition, Allied is also liable for Sack and Boyle's conduct based upon an agency relationship.

### E.    Tortious Interference with Business Relations and Tortious Interference with Contract

APTIM meets the requisite standard to show that it has a likelihood of success in proving that Defendants tortiously interfered with APTIM's business relations, specifically the expectancy of continued employment that APTIM had in relation to its employees. Under Illinois law, the elements of this claim are: "(1) the existence of a valid business relationship or expectancy; (2) the defendants' knowledge of plaintiff's relationship or expectancy; (3) an intentional and unjustified interference by the defendant inducing or causing a breach or

termination of the expectancy; (4) damages to plaintiff resulting from such interference." *James v. Intercontinental Hotels Grp., Res., Inc.*, No. 09-cv-781, 2010 WL 529444, at *3 (N.D. Ill. Feb. 10, 2010). An at-will employment relationship can serve as the basis for a claim for tortious interference. *See id.*; *see also Ali v. Shaw*, 481 F.3d 942, 944-45 (7th Cir. 2007); *cf. Dowd & Dowd, Ltd. v. Gleason*, 816 N.E.2d 754, 768 (Ill. App. Ct. 2004). APTIM will also be able to establish two separate tortious interferences with contract. A claim for tortious interference with contract is similar to a claim for tortious interference with business relations, except a plaintiff must prove "the existence of a valid and enforceable contract between the plaintiff and a third party." *Echo, Inc. v. Timberland Machs. & Irrigation, Inc.*, 661 F.3d 959, 968 (7th Cir. 2011). "Establishing inducement, in the context of a claim for tortious interference with a contract, requires some active persuasion, encouragement, or inciting that goes beyond merely providing information in a passive way." *Freed v. JPMorgan Chase Bank, N.A.*, No. 12 C 1477, 2012 WL 6193964, at *6 (N.D. Ill. Dec. 12, 2012) (citation omitted).

With respect to the claim for tortious interference with business relations, each of the Defendants had knowledge of the Company's expectancy that it would continue to employ Sack, Boyle and its other employees whom they solicited to Allied. Sack and Boyle breached their fiduciary duties, and Allied aided and abetted those breaches, when Defendants interfered with APTIM's expectancy of continuity intentionally and unjustifiably. APTIM has suffered damage because of the Defendants' tortious interference as APTIM has lost employees and may lose clients.

Defendant Allied tortiously interfered with McCall's agreements with the Company. APTIM will be able to establish that Allied tortiously interfered with Sack's and Boyle's confidentiality agreements. These agreements are commonplace in the industry and at the

17

Company, where Allied's CEO was a senior management employees. As such, Allied must have known about Sack's and Boyle's confidentiality obligations, and in ratifying their misconduct in order to steal APTIM's business and employees, Allied tortiously interfered with the confidentiality agreements.

### F.    Civil Conspiracy

There is a strong likelihood that APTIM will be able to establish that all Defendants conspired to carry out all the above-described tortious conduct. A civil conspiracy requires "(1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Lane v. Money Masters, Inc.*, No. 14-cv-1715, 2015 WL 225427, at *10 (N.D. Ill. Jan. 15, 2015). To be liable for civil conspiracy, only "one of the parties to the agreement [must] commit[] some act in furtherance of the agreement, which is itself a tort." *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994).

As described above, Allied conspired to tortiously interfere with McCall's employment agreement and nonsolicitation and noncompete agreement and Sack's and Boyle's confidentiality agreements with the Company. Allied acted in furtherance of that conspiracy by hiring McCall, Sack and Boyle. Additionally, Defendants conspired to acquire APTIM's trade secrets, as described above. Sack and Boyle have acted and, upon information and belief, continue to act in furtherance of that conspiracy by stealing APTIM's confidential information in violation of the DTSA and CFAA and wrongfully poaching employees of the Company. APTIM has suffered and continues to suffer significant damages because of the Defendants' concerted actions.

## II.    NO ADEQUATE REMEDY AT LAW EXISTS AND APTIM WILL SUFFER IRREPARABLE INJURY IF THE INJUNCTION IS NOT GRANTED

To determine whether a plaintiff will suffer irreparable injury absent injunctive relief, "[t]he relevant inquiry is whether the plaintiff would be made whole by monetary damages should he prevail at trial." *Fidlar Techs. v. LPS Real Estate Data Sols., Inc.*, No. 4:13-cv-4021-SLD-JAG, 2013 WL 5973938, at *18 (C.D. Ill. Nov. 8, 2013) (citing *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)).  Monetary damages need not be "wholly ineffectual" but rather "seriously deficient as a remedy for the harm suffered." *Roland Mach.*, 749 F.2d at 386.  "The inadequacy of legal remedies and the threat of irreparable harm are inherent in cases such as these when . . . trade secrets are at issue." *IDS Life Ins. Co. v. SunAmerica, Inc.*, 958 F. Supp 1258, 1281 (N.D. Ill. 1997), *aff'd in part, vacated in part on other grounds sub nom., IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537 (7th Cir. 1998).  Moreover:

> [W]here trade secrets and confidential information are at issue, as they are here, irreparable harm flows necessarily from the actual or threatened loss of the important protectable business interests at stake.  Therefore, a preliminary injunction is the only remedy adequate to curtail the irreparable harm that would otherwise inevitably follow.

*PepsiCo, Inc. v. Redmond*, No. 94 C 6838, 1995 U.S. Dist. Lexis 19437, at *84 (N.D. Ill. Jan. 26, 1995), *aff'd* 54 F.3d 1262, 1269 (7th Cir. 1995).

APTIM does not have an adequate remedy at law for its causes of action and will suffer irreparable harm if emergency injunctive relief is not granted.  Sack and Boyle stole highly confidential and proprietary information, including trade secrets from the Company, and Defendants *continue* to hold and use such information to solicit employees of APTIM and gain an unearned advantage in soliciting APTIM's clients.  In addition, Defendants' wrongful conduct has resulted in significant losses of high-level, talented employees, in whom the Company made

significant investments of time and resources, including for training and professional development. Monetary damages are inadequate to compensate APTIM for its incurred and continuing losses owing from Defendants' misconduct, which extend to adversely impact APTIM's reputation, client and employee relationships and ability to fairly compete in the marketplace.

Absent an injunction, Defendants will continue to use and disclose APTIM's trade secrets and confidential information, causing ongoing harm to APTIM's competitive position—a loss that cannot be readily calculated or necessarily cured by monetary damages. *See Huawei Techs. Co. v. Motorola, Inc.*, Civil Action No. 11-cv-497, 2011 WL 612722, at *10 (N.D. Ill. Feb. 22, 2011). In addition, the continued misappropriation of the Confidential Company Information potentially undermines client confidence in APTIM and its reputation, as APTIM has access to trade secrets and other information belonging to its clients in the course of its business. To the extent that APTIM's ability to protect such confidential data is compromised, the significant risk to APTIM's reputation, goodwill and client relationships warrants the relief APTIM seeks. Such damages are incalculable and meet the requisite standard for establishing irreparable harm. *See, e.g.*, *Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc*., 420 F. Supp. 2d 866, 872 (N.D. Ill. 2006) (granting preliminary injunction where in the absence of injunctive relief plaintiff would "lose goodwill, competitive position, and continuity of business relationships with its customers and employees").

## III.    THE BALANCE OF INTERESTS FAVORS INJUNCTIVE RELIEF

Because APTIM meets the threshold requirements for a preliminary injunction, the Court should engage in the balancing of interests to determine whether the interests favor a restraining order and injunction. In so doing, the court weighs the "irreparable harm that the moving party

20

would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). The balancing process employs a "sliding scale" approach, meaning, "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weighs in his favor; the less likely his is to win, the more need it weigh in his favor." *Id.* (alteration in original). The court also considers the public interest involved, including the effect of relief on non-parties. *See id*.

Because APTIM has demonstrated a substantial likelihood that it will succeed on the merits of its claims, the balance of harm need not decisively weigh in APTIM's favor. Nevertheless, the balance of harm here decidedly weighs in favor of APTIM and provides further support that the emergency injunctive relief APTIM requests should be granted. Absent immediate injunctive relief, APTIM's confidential trade secret information, wrongly taken by Sack and Boyle as they planned their departure to a competitor, will continue to be used by Defendants to garner ill-gained and unfair advantages in the marketplace. In contrast, the only injury Defendants might suffer would be the inability to use the confidential and propriety information that no Defendants own or have any right to possess, use, disclose or dispose of. There can be no question that, in this balancing equation, APTIM is the only one that conceivably could suffer harm. *See, e.g.*, *ISC-Bunker Ramo Corp. v. Altech, Inc.*, 765 F. Supp. 1310, 1335 (N.D. Ill. 1990) (defendant had "no equitable standing to complain of being deprived of the use of information, manuals, software and procedures that it had no right to use and appropriate in the first instance").

As a general rule, the "public interest is well-served by enforcing valid agreements," like those entered into by the parties in this case. *Huawei Techs.*, 2011 WL 612722, at *10. As

21

courts have recognized, the "public has no interest in destroying contracts, rewarding theft, and encouraging unethical business behavior." *IDS*, 958 F. Supp. at 1282. Accordingly, the public interest is advanced by reinforcing the contractual and other obligations that were breached as a result of Defendants' wrongful conduct. The balance of harms plainly favors the issuance of a temporary restraining order and a preliminary injunction. The targeted relief sought by APTIM is simply to ensure that Defendants divest of information to which they had no right, prevent them from continuing to use such information to solicit APTIM's employees and clients, further misappropriating the trade secrets, and to allow APTIM to fully account for the stolen Confidential Company Information.

## CONCLUSION

Based upon the foregoing, APTIM respectfully requests this Court to enter an order (1) temporarily restraining and enjoining Allied, Sack and Boyle from continuing to possess, access, review, use, disclose or misappropriate Confidential Company Information; (2) temporarily restraining and enjoining Allied, Sack and Boyle from soliciting or attempting to solicit any employees or clients of APTIM based directly or indirectly, in whole or in part, on any Confidential Company Information; (3) compelling Allied, Sack and Boyle to immediately return all Confidential Company Information that each Defendant obtained or misappropriated; (4) compelling Allied, Sack and Boyle to immediately produce or provide access for forensic examination any and all personal email accounts, phones, laptops, text messaging and social media services, etc. and hard drives, cloud storage, USB drives or storage devices in their possession, custody or control that may have been used to obtain or retain APTIM's confidential and trade secret information; (5) ordering Allied, Sack and Boyle to provide a full accounting as

to the whereabouts of all Confidential Company Information wrongfully obtained from APTIM;

and (6) granting any other such relief the Court deems just and proper.

DATED:      July 20, 2017
                Chicago, Illinois

                                  Respectfully submitted,

                                  SKADDEN, ARPS, SLATE,
                                    MEAGHER & FLOM LLP

                                  /s/ Patrick Fitzgerald
                                  Patrick Fitzgerald
                                  Eric J. Gorman
                                  155 North Wacker Drive
                                  Chicago, Illinois 60606
                                  Telephone: (312) 407-0700
                                  E-mail: patrick.fitzgerald@skadden.com
                                          eric.gorman@skadden.com

                                  *Counsel for Plaintiff Aptim Corp.*

*Of counsel:*

SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Lauren E. Aguiar (*pro hac vice* motion pending)
David E. Schwartz (*pro hac vice* motion pending)
Four Times Square
New York, New York 10036
Telephone: (212) 735-3000
E-mail: lauren.aguiar@skadden.com
      david.schwartz@skadden.com

23