**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APTIM CORP.,

                               :

                Plaintiff,

                               :     Case No. 1:17-cv-05269

        v.

                               :     Judge Charles R. Norgle

ALLIED POWER MANAGEMENT, LLC,
ALLIED POWER SERVICES, LLC,         :     Magistrate Judge M. David Weisman
BERNHARD CAPITAL PARTNERS
MANAGEMENT LP, BCP ENERGY         :
SERVICES FUND, LP, DEAN SACK,
VICTORIA BOYLE, JOHN PLUMLEE,    :     JURY TRIAL DEMANDED
ROBERT NEVIN and JESSICA LEE,

                               :

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### PLAINTIFF APTIM CORP.'S SECOND AMENDED COMPLAINT

Plaintiff Aptim Corp. ("APTIM" or the "Company"), by and through its undersigned attorneys, submits this Second Amended Complaint against Allied Power Management, LLC ("Allied Management"), Allied Power Services, LLC ("Allied Services" and together, "Allied"), Bernhard Capital Partners Management LP, BCP Energy Services Fund, LP ("BCP-ESF" and together, "BCP"), Dean Sack ("Sack"), Victoria Boyle ("Boyle"), John Plumlee ("Plumlee"), Robert Nevin ("Nevin") and Jessica Lee ("Lee") (the individuals collectively, the "Individual Defendants" and all collectively the "Defendants"), and hereby alleges upon personal knowledge with respect to itself and its own acts, and upon information and belief as to all other matters, as follows:

## NATURE OF ACTION

1. At a time that Defendants knew would cause maximum disruption to APTIM, they carried out an illicit campaign to steal one of APTIM's most important customers and a number of its key employees servicing that account. In furtherance of this objective, Defendants misappropriated, and continue to use, APTIM's confidential information and trade secrets, as well as a substantial number of valuable Company documents. Through these unjust acts, Defendants jump-started a fledgling company into one that could steal the Company's largest client virtually overnight.

2. This was accomplished by people inside the Company,[1] with Defendant Sack as one of the ringleaders. While still working as a project manager on behalf of the Company's largest customer, Exelon Corporation ("Exelon"), Sack took actions harmful to the Company in order to benefit a new competitor, Allied. Indeed, three days before Sack left the Company—giving no notice, and on the same day he received an employment agreement from Allied—he stole confidential information and trade secrets from the Company for the benefit of Allied. For instance, Sack sent to his private e-mail address an Excel file with proprietary employment-related information for more than 1,500 Company employees, filling almost 60,000 cells of data. Then, he set out to poach additional employees from the Company using the information in the Excel file he stole. In the span of two weeks in June 2017, fifteen key employees (including

---

[1] Plaintiff APTIM Corp. is the successor in interest to the Capital Services operating segment of Chicago Bridge & Iron Company N.V. ("CB&I"). CB&I acquired most of this business when it merged with The Shaw Group Inc. ("Shaw") in 2013. This Complaint includes facts that took place before, during and after Shaw's businesses were sold to CB&I and later again sold to APTIM. For the sake of clarity, this Complaint refers to each entity as it was properly called at the time when the facts described took place but also refers to the business segment that passed from Shaw to CB&I to APTIM as the "Company." Unless otherwise specified, all references herein to CB&I and Shaw involve individuals, rights and interests that have been assigned to APTIM, including but not limited to all employment agreements, restrictive covenants, confidentiality agreements and any other policies of the Company relating to its employees.

Defendants Sack and Boyle), resigned from the Company, all at Allied's prompting, including seven on one day.

3. Ultimately, Exelon terminated its relationship with the Company. In fact, Sack admitted that he took these actions after hearing of alleged concerns from Exelon about the sale of the Company to a new owner. But rather than addressing these concerns or notifying his supervisors to help the Company—his employer—preserve its contract with Exelon, he turned the information to his own, and Allied's, advantage.

4. Sack had assistance in targeting the Company's employees, including from Defendant Boyle. Boyle, a former human resources specialist at the Company, misappropriated and continues to use the Company's confidential information and trade secrets (separate from those used by Sack) to solicit Company employees working on projects for Exelon and another key client ("Major Client 2"), among potential others. Meanwhile, Defendants Nevin and Lee assisted in misappropriating hundreds of the Company's confidential documents, which they improperly converted into new documents to be used by Allied to help it unfairly compete against APTIM.

5. BCP, which was founded by Jim Bernhard, is funding Allied. In 2013, Bernhard sold his former company, The Shaw Group Inc., for more than $3 billion to Chicago Bridge & Iron Company N.V. and ended his employment with Shaw. After he sold Shaw, Bernhard started to lay the groundwork to create a series of competing businesses, including Allied. As set forth below, Allied is building its senior staff and customer base by poaching the Company's employees and stealing its confidential information.

6. As of May 2017, Allied had no management team, no contracts and no customers. BCP needed individuals that were experienced in the industry to run Allied, so BCP turned to

Ron McCall ("McCall") and John Plumlee, both of whom Bernhard knew from their days together at Shaw. McCall became the CEO of Allied, and Plumlee became its COO. Together, they helped BCP create a company to compete with APTIM and steal its key customers. BCP (through McCall and Plumlee) started with Exelon, which it solicited using the Company's confidential information, which Plumlee had improperly retained from his days at the Company and which he continued to access long after leaving the Company. McCall and Plumlee in turn needed another Company insider, making it logical that they would turn to Sack, one of McCall's most loyal former employees who ran the Exelon account. By successfully soliciting Sack, who had misappropriated the Company's confidential information and trade secrets, Allied, BCP, McCall and Plumlee induced Sack to breach his confidentiality agreements with the Company.

7. This wrongful diversion of the Company's information and individuals has necessitated this action for interim injunctive relief and damages, arising under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, as well as the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.*; Illinois common law claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, tortious interference with business relations and contract, civil conspiracy, unfair competition and unjust enrichment; and breach of contract.

8. The Company seeks to enjoin the Defendants from any continued use of or access to any of the Company's confidential information and trade secrets and to force them to return all such information. Allied continues to solicit Company employees and is using the Company's confidential information to do so. As a result, APTIM is suffering and absent injunctive relief will continue to suffer significant and irreparable harm. Additionally, the Company seeks to

4

recover damages and other relief for the significant harm it has suffered in relation to the Defendants' concerted tortious actions.

## THE PARTIES

9.    Plaintiff APTIM is a Delaware corporation with its principal executive offices located in The Woodlands, Texas.  APTIM is the successor to the Capital Services operating segment of CB&I.  APTIM is a leading provider of operations and maintenance support services; environmental engineering and remediation; infrastructure engineering; procurement, construction and decommissioning; program management for disaster response; and emergency response and disaster recovery for private sector and federal, state and local government customers.

10.    Defendant Allied Power Management is a Delaware LLC with its principal place of business at 400 Convention Street, Baton Rouge, LA 70802.  According to its website, Allied provides services for power plants, focused on the utility industry.  According to filings with the SEC, Delaware Secretary of State, Louisiana Secretary of State and Illinois Secretary of State, Allied Power Management's members are domiciled in Louisiana, and none are domiciled in Texas.

11.    Defendant Allied Power Services is a Delaware LLC with its principal place of business at 400 Convention Street, Baton Rouge, LA 70802.  It was created to operate Allied's power maintenance services business.  Upon information and belief, its sole member is Allied Power Management.  According to filings with the SEC, Delaware Secretary of State, Louisiana Secretary of State and Illinois Secretary of State, Allied Power Services' members are domiciled in Louisiana; none are domiciled in Texas.

12.     Defendant BCP is a Delaware limited partnership with its principal place of business at 400 Convention Street, Baton Rouge, LA 70802.  BCP is a private equity management firm, with investments in energy industry service-related companies.  It was founded in 2013 by Jim Bernhard, after he stepped down as CEO of Shaw upon its sale to CB&I in early 2013.  According to filings with the SEC, Delaware Secretary of State, Louisiana Secretary of State and Illinois Secretary of State, BCP's partners are domiciled in Louisiana.

13.     Defendant BCP-ESF is a Delaware limited partnership with its principal place of business at 400 Convention Street, Baton Rouge, LA 70802.  BCP-ESF is a BCP "client" fund through which BCP raises money and invests in service companies across the energy industry.

14.     Defendant Sack is a resident of Peru, Illinois.  Sack was a Vice President at CB&I, where he oversaw CB&I's account for Exelon.  He resigned from CB&I on June 2, 2017.  He is currently a Vice President at Allied.

15.     Defendant Boyle is a resident of Shorewood, Illinois.  Boyle is the former Recruiting Director for CB&I's Exelon account.  She resigned from CB&I on June 5, 2016.  She is currently employed at Allied.

16.     Upon information and belief, Defendant Plumlee is a resident of Katy, Texas.  Plumlee was a Vice President in Shaw's Plant Services Division.  He resigned from Shaw in 2009.  He is currently the Chief Operating Officer of Allied.

17.     Upon information and belief, Defendant Nevin is a resident of Ottawa, Illinois.  Nevin is a former Executive Director of CB&I's Capital Services business segment for the Exelon account.  He resigned from CB&I on June 5, 2017.  He is currently employed at Allied.

18.     Upon information and belief, Defendant Lee is a resident of Darien, Illinois.  Lee is a former staff assistant who worked on the Exelon contract for CB&I.  She resigned from CB&I on June 7, 2017.  She is currently employed at Allied.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over APTIM's federal claims pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836, the Computer Fraud and Abuse Act, 18 U.S.C. § 1830 *et seq.* and 28 U.S.C. § 1331.  Additionally, the Court has supplemental jurisdiction over the state law claims alleged in this Complaint pursuant to 28 U.S.C. § 1367.

20.     Venue lies in the United States District Court for the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claims alleged in this Complaint occurred in this district.

21.     This Court has personal jurisdiction over the Defendants because they have either committed tortious acts within the State of Illinois or have directed their tortious conduct toward the State of Illinois.  The causes of action stated herein all arise out of the Defendants' contacts with the State of Illinois.

## STATEMENT OF FACTS

### I.     Background

22.     Shaw was a Fortune 500 company that provided services in the energy, chemical, power, environmental and infrastructure industries.  It was co-founded by Jim Bernhard in 1986. He served as its CEO until February 2013, when CB&I acquired Shaw for approximately $3 billion.  While serving as CEO, Bernhard closely managed the company and no significant action took place without his knowledge and consent.

23.     CB&I was founded in 1889 in Chicago, Illinois and grew over time to become one of the world's largest engineering, procurement and construction companies. When CB&I acquired Shaw, Bernhard stepped down as CEO of Shaw, leaving with a two-year non-compete agreement in place.

24.     CB&I underwent a series of internal restructurings after it purchased Shaw. Among other things, it created a Capital Services operating segment consisting primarily of Shaw's former Environmental & Infrastructure and Plant Services business divisions.

25.     On June 30, 2017, Plaintiff APTIM acquired the Capital Services business from CB&I for approximately $700 million. At the time of the sale, the Capital Services business had about 15,000 employees located in 76 facilities.

26.     For many years, the Company enjoyed a strong business relationship with Exelon, one of its largest clients. The Company provided Exelon with both services (including labor, supervision and administration) and materials (including equipment, supplies and products) under a Services and Materials Agreement. Defendants knew that Exelon contributed significantly to the Company's revenue.

27.     The Company's employees servicing Exelon worked in Exelon's facilities on a full-time basis. Many of the senior Company employees who oversaw operations at the Exelon facilities had access to, and used, Exelon computers and e-mail addresses.

28.     Dean Sack served as the Company's executive in charge of the Exelon account. Robert Nevin, Executive Director of the account, reported to Sack. Two regional directors, Michael Less (for the Midwest) and Graham Cross (for the Mid-Atlantic and Northeast) also served Exelon. In these capacities, both Less and Cross supervised, among others, each facility's Site Manager, Work Control Superintendent and Production Superintendent. Two Human

Resources and Staffing employees (including Boyle, who recently left to work at Allied), a Safety Manager and a Training Coordinator also served in critical roles on the account. Lee served as a staff assistant to Sack and Nevin and performed a variety of administrative projects for them.

29. These key management level Company employees worked side-by-side with many Exelon employees for years. They understood, more than anyone, the nuances of the Company's relationship with that client. They knew Exelon's facilities, operational needs and workforce. Steeped in the procedures governing this business, the Company's employees oversaw this relationship and developed strategies to ensure that it would continue and succeed.

## II.     BCP Establishes Competing Entities

30. In April 2013, two months after CB&I's purchase of Shaw, Bernhard formed BCP with two other Shaw-affiliated individuals, Jeff Jenkins and Albert McAlister. On October 22, 2014, BCP filed documents with the U.S. Securities and Exchange Commission ("SEC") disclosing its intent to raise $750 million for its fund, BCP-ESF. Since that time, the *Greater Baton Rouge Business Report* ("*Business Report*") has continued to track BCP's emerging competition with CB&I.

31. Just after Bernhard's two-year non-compete agreement with CB&I expired, on February 26, 2015, Bernhard and his BCP partners founded an energy services firm. In July 2015, in an article entitled "Shaw 2.0? Jim Bernhard is taking a page from his Shaw playbook to grow a family of companies that could rival CB&I," the *Business Report* wrote that Bernhard apparently was creating "Shaw 2.0." As it reported:

> When Jim Bernhard retired from The Shaw Group in the wake of his company's 2013 acquisition by CB&I, some speculated he would run for office. Others thought he might get into real estate. For his part, Bernhard would say only that he and three of his closest colleagues from Shaw were

forming a private equity firm that would raise billions of dollars and invest in companies.

Two years later, it's pretty clear what Bernhard is doing. The firm, Bernhard Capital Partners, is raising money all right—money to build a network of companies that do what The Shaw Group did and are being run by former executives and managers who worked there under Bernhard.

To call it Shaw 2.0, as some in the business community jokingly do, might be an overstatement—but not by much.

* * *

"He's taking a page from the playbook he used to grow Shaw," says David Dismukes, executive director at LSU's Center for Energy Studies. "Shaw grew in this way, through acquisitions in the 1990s. But this is what he excels at: putting deals together and putting teams together."

Bernhard also is known for being aggressive and ruthlessly competitive, traits that will serve him well as the companies he controls go up directly against CB&I for jobs and labor. . . .

32.    On November 30, 2015, the *Business Report* contributed another story, entitled

"Is Jim Bernhard building a bigger, better Shaw Group?"  As the article explains:

For much of the past year, Bernhard and his growing number of seasoned associates at Bernhard Capital Partners—the private equity firm he founded after retiring from The Shaw Group in the wake of its acquisition by CB&I—have been systematically gobbling up mechanical, electrical, and industrial construction firms in the region. They've also acquired pipe fabrication facilities, major engineering companies and environmental consulting firms that, together, have offices, employees and job sites throughout the country.

33.    This article also highlighted that Bernhard clearly was the man behind BCP,

which was purchasing and operating multiple companies:

The deals are complicated and their terms have not been disclosed, except to say that all the companies remain independently owned and operated. But whatever their ownership structure on paper, the companies all fall under the umbrella of BCP, which has invested in them all, either directly or through a separate holding company.

10

> In the legal and corporate finance world, that may be a critically important detail. As far as the general public is concerned it's a distinction without a difference. Bernhard is the common thread, the man behind the curtain, and he's putting together something really big in Baton Rouge. Again.

34.   On June 8, 2016, the *Business Report* offered another update, which included the following:

> Some say BCP is out to build a better Shaw. Some even jokingly refer to the portfolio of BCP companies as Shaw 2.0. It's hard to resist the inevitable comparisons. With holdings in pipe fabrication, industrial maintenance and construction, and environmental services, BCP has amassed a family of companies that do what the various divisions of Shaw did. Running them are many of the same men—yes, they are all men—who ran Shaw with Bernhard.
>
> * * *
>
> Some of those management teams are made up almost exclusively of former Shaw executives. Epic Piping's six top executives all came from Shaw, including David Chapman, Kent Shepherd and Remi Bonnecaze. So did Brown and Root's CEO Andy Dupuy and COO Fred McManus. In the BCP corporate structure itself are five Shaw alumni.
>
> * * *
>
> Those personal connections and longtime bonds have gone a long way toward explaining BCP's early success. These guys have known each other and worked together for years. Their shared history enabled them to hit the ground running from day one.

35.   Upon information and belief, in the second half of 2016, Bernhard went into business with Charah, Inc. ("Charah"), at the time a Kentucky corporation, based in Louisville, Kentucky.  According to its website, Charah is "the largest privately-held provider of coal combustion product management for the coal-fired power generation industry in the U.S."

36.   In December 2016, Charah restructured itself from a corporation into an LLC.  At the same time, it registered two entities in the State of Delaware: Charah Holdings GP LLC and Charah Holdings LP.  On their registration documents, both of these entities list an address in

Louisiana, the same address as BCP's office (*e.g.* Charah Holdings GP LLC, c/o Bernhard Capital Partners, 400 Convention Street, 10th Floor, Baton Rouge, LA 70802).

37.     On April 19, 2017, Allied Power Holdings LLC was registered with the State of Delaware. Its sole member is Charah Holdings LP. This entity, like its sole member, lists its address as 400 Convention Street, 10th Floor on its Louisiana Secretary of State filing. Allied Services was registered the same day.

38.     On May 30, 2017, Allied Management was registered with the State of Delaware. Its member is Allied Power Holdings LLC. This entity, like all its affiliated entities, provides the address of BCP on its Louisiana Secretary of State filings. By way of illustration:



39.     Upon information and belief, Allied Management is the sole member of Allied Services, which is merely the services branch of Allied and has no purpose but to benefit its sole member Allied Management. Allied Services has the same office address as Allied Management and has the same executives.

**III.     McCall and Plumlee Join BCP, Then Co-Found Allied**

    **A.     McCall "Retires," Then Immediately Joins BCP**

40.     BCP's prior ventures have all been permissibly in competition with the Company, but its new venture, Allied, has overstepped that line.  First, to create Allied from scratch, BCP needed operational help and an experienced industry executive to run the company.  Bernhard turned to McCall, with whom he had worked at Shaw.

41.     McCall worked at Shaw from 2002 until January 1, 2016, when his retirement became effective.  At the time of his retirement, McCall was President of CB&I's Facilities and Plant Services business division, within the Capital Services operating segment.  His primary responsibilities included overseeing the Division's business lines, including Power Maintenance, Process Maintenance, Construction, Program Management and Environmental.

42.     In 2011, when McCall told Bernhard (then-CEO of Shaw) that he intended to retire, Bernhard persuaded McCall to stay by offering him a new employment agreement with a better compensation package.  McCall entered into this employment agreement on June 4, 2012, effective January 1, 2012 (the "Employment Agreement").  On the same date, McCall signed Exhibit A to that contract, entitled "Nonsolicitation and Noncompete Agreement," also effective as of January 1, 2012 ("Noncompete Agreement").

43.     The Noncompete Agreement prohibits McCall from soliciting Company employees for two years after his employment ends:

> Section 2.     <u>Non-Solicitation</u>.     At all times during Executive's employment and for two (2) years after the termination of Executive's employment, Executive will not, directly or indirectly, either on Executive's own account or jointly with or as a manager, agent, officer, employee, consultant, independent contractor, partner, joint venture, owner, financier, shareholder, or otherwise on behalf of any other person, firm, or corporation, offer employment to, solicit, or attempt to solicit away from the Company or its affiliates any of their officers or employees

13

or offer employment to any person who, during the six (6) months immediately preceding the date of such solicitation or offer, is or was an officer or employee of the Company or any of its affiliates.

44.     The agreement also contains a "Covenant Not to Compete," which provides, in relevant part:

(d)     Executive agrees that at all times during Executive's employment with the Company and for a the [*sic*] duration of the Post-Termination Non-Compete Term (defined in Section 3(e) below), Executive shall not, directly or indirectly, whether personally or through agents, associates, or co-workers, whether individually or in connection with any corporation, partnership, or other business entity, and whether as an employee, owner, partner, financier, joint venture, shareholder, officer, manager, agent, independent contractor, consultant, or otherwise, establish, carry on, or engage in a business similar to that of the Company or any of its affiliates, in the Restricted Area, as defined in Exhibit 1, attached.  This prohibition includes, without limitation, that Executive will not perform the following in the Restricted Area:

(i)     Solicit or provide, directly or indirectly, engineering, construction, procurement, maintenance, Environmental, and pipe fabrication services, or any of these, to any persons or entities who are or were customers of the Company or any of its affiliates at any time prior to Executive's separation from employment;

(ii)     Establish, own, become employed with, consult on business matters with, or participate in any way in a business engaged in engineering, construction, procurement maintenance, Environmental, and pipe fabrication services, or any of these, except to the extent that the Company or any of its affiliates do not provide the same type of services as such business provides; and

(iii)     Provide consulting services for, invest in, become employed by, or otherwise become associated from a business perspective with competitors of the Company or any of its affiliates, including but not limited to Jacobs Engineering Group Inc.; Fluor Corporation; URS Corporation; Halliburton; Turner Industries Group, L.L.C.; Bechtel Group, Inc.; KBR, Inc.; Chicago Bridge & Iron Company N.V.; CH2M Hill; Black & Veatch Corporation; Foster Wheeler Ltd.; and Washington Group International, Inc., or any of their respective subsidiaries, parent companies, affiliates, or successors.

This prohibition does not prohibit Executive from engaging in a business solely within an area or areas not contained in the Restricted Area, so long as that business does not provide in the Restricted Area the same or similar services or conduct the same or similar business as the Company or its affiliates.

14

45.     McCall's non-competition and non-solicitation covenants, which were assigned to APTIM, remained in force until January 31, 2018.

46.     After leaving CB&I, McCall nonetheless went back to work.  APTIM recently learned that McCall agreed to reunite with Bernhard, as he began working for BCP, including through a contract with BCP-ESF entered into in March 2016, in clear breach of the Noncompete Agreement.  In McCall's role, he assisted BCP in assessing investments in the same industry in which the Company operates, in further breach of his Noncompete Agreement.[2]

47.     BCP recruited McCall to work for it, despite Bernhard, its name partner, being fully aware of McCall's Noncompete Agreement with the Company.  Indeed, Bernhard was the very person McCall turned to while at Shaw in order to seek a new employment agreement.  BCP thus must have also been aware of the Noncompete Agreement because of Bernhard's knowledge and his role as founding partner of BCP.  By persuading McCall to work for BCP, BCP wrongly and unjustifiably induced McCall to breach his Noncompete Agreement.

**B.     McCall and Plumlee Create a Rival Business with Company Information**

48.     McCall needed support to start a competing business, so at the behest of BCP, he turned to another former Shaw employee, John Plumlee.  Plumlee had worked at Shaw from 2005 until 2009, eventually in the role of Executive Vice President of Operations of Shaw's Plant Services Division.  He had worked alongside McCall and Bernhard there.  He also knew the Exelon business well as a result.

---

[2] McCall's Employment Agreement and Noncompete Agreement both contain arbitration provisions, and APTIM has commenced an arbitration proceeding against McCall with the American Arbitration Association.

49.     Plumlee added extra value: he had retained virtually all of his files from his days working at Shaw.  Despite it being strictly against Company policy, and the confidentiality agreement that all employees were required to sign, Plumlee maintained on his computer tens of thousands of confidential Company documents.  With that information in hand and readily available to consult, Plumlee entered into an agreement with BCP-ESF to perform work for BCP beginning in July 2016.

50.     During the course of the next year, Plumlee and McCall used the Company information misappropriated by Plumlee to steal the Company's business with Exelon.  Plumlee and McCall specifically solicited Exelon (McCall doing so in violation of his Noncompete Agreement) to steal that business from the Company.  In one instance, on February 6, 2017, in advance of a meeting with Exelon in Illinois, Plumlee e-mailed McCall a confidential Company spreadsheet, entitled "Exelon FY09 W2 Forecast.xls," with detailed financial information about the Company's relationship with Exelon, which Plumlee had improperly retained on his computer.  In calculating new projected financials for their meeting with Exelon, Plumlee noted to McCall that he was sharing with him the newest version in his possession.

51.     To shield its own involvement, BCP created new entities to steal the Exelon business.  BCP used assets raised through its BCP-ESF fund, formed Allied Services and Allied Management  in April and May 2017, respectively, and installed McCall as CEO and Plumlee as COO.  McCall thereby yet again breached his Noncompete Agreement with the Company, and by BCP installing McCall as the CEO of its newly formed entity, BCP again wrongly interfered with McCall's Noncompete Agreement.

52.     Allied also must have been aware of the interference with McCall's Noncompete Agreement because upon Allied's formation, its only leader other than McCall was Plumlee,

16

who worked alongside him at BCP. Additionally, Allied had knowledge because it was at the time controlled by BCP. In line with Bernhard's hands-on management style, upon Allied's formation, it was staffed by BCP employees, funded by BCP and located at BCP's offices.

53.     Additionally, McCall and Plumlee were working for BCP when communicating with Exelon, a company based and operating in Illinois, despite McCall's Noncompete Agreement expressly and explicitly forbidding such conduct. Having ratified, or explicitly approved, the conduct of its agents in or directed at this state, BCP improperly interfered with both the Company's agreement with Exelon and the nonsolicitation provisions of McCall's Noncompete Agreement.

## IV.     Dean Sack Steals Trade Secrets, Then Follows McCall to Allied

54.     BCP and Allied's next target was Dean Sack. Sack began working for the Company in 2007 as a Site Manager, and he continued to work his way up the ladder during his time there. Sack worked under the leadership of McCall and over time, a mutual admiration developed between them, especially regarding the caliber of each other's work. For instance, in January 2012, McCall hand wrote a message to Sack (and another employee who left for Allied, Dean Cross):

> Dean, Graham
> This is a great reflection of you & your team's efforts Congratulations! Please pass along my sincere appreciation for all the hard work & your effort to meet & exceed Exelon's expectations. Dean & Graham we appreciate your leadership more than you can imagine. Thanks!
> Ron McCall
> 1/24/12

Sack similarly returned praise for McCall. In an e-mail dated January 24, 2015, Sack wrote to McCall: "I would also like to thank you for considering me as second in command to Mr. Ron McCall <u>it was a huge HONOR</u>." Later in the same e-mail he wrote: "I am the most loyal soldier

you will ever have Ron so let's figure out what we need to do to move forward and be the best company we can be in the [client's] field."

55.     Sack rose through the ranks and on March 8, 2016, he was appointed Vice President of Operations, in charge of the Company's account for Exelon.

### A.     BCP and Allied Solicit Dean Sack

56.     Allied was a start-up, so BCP needed to continue developing Allied's management team.  Having already recruited McCall as the CEO, BCP turned to McCall for help in recruiting individuals from the Company.  First up was Sack—McCall's "loyal soldier." McCall, on behalf of BCP, encouraged Sack to leave the Company and join McCall at Allied (and in the process, McCall again breached his Noncompete Agreement).

57.     According to assertions by Allied's employees, Exelon reportedly had expressed concerns about the sale of the Capital Services business to APTIM, which was announced on February 28, 2017.  After that time, soon-to-be Allied employees, including Plumlee and McCall, were apparently told by Exelon of its apparent dissatisfaction with certain aspects of that announced transaction.  Additionally, Company employees, such as Boyle, now assert that they were told by Exelon employees that they were dissatisfied with aspects of the Company's performance as well as its pending transaction.  To the extent such concerns were expressed, Sack, as the most senior executive on the account, surely knew as well.  Rather than passing such concerns along to more senior executives at the Company, however, Sack shared them with the new prospective competitor—and his new prospective employer—Allied.

58.     In accepting Allied's offer, instead of attempting to address Exelon's supposed concerns about its relationship with the Company, Sack opted to *leave* the Company.  In doing

so, he leveraged his insider knowledge of Exelon's purported concerns to Allied's benefit and APTIM's detriment, thus wrongly usurping the Company's corporate opportunities.

### B. Sack Misappropriates Company Information to Benefit BCP and Allied

59. As BCP and Allied were then actively soliciting Exelon, Allied needed not only Sack, but also the *information* that Sack possessed, just like Plumlee (who had retained his Company computer files). Bringing Sack was key to Allied's plan to steal business from the Company's key customers. Not only could Sack provide essential insight into the Exelon account, but he also had access to critical information regarding the Company's employees who serviced Exelon.

60. On May 30, 2017, Plumlee, now at Allied, sent Sack a copy of an employment agreement for him to sign with its entity Allied Services. *On that same day*, to benefit Allied and its affiliates, Sack sent an e-mail from his Company e-mail account to his private Hotmail e-mail account, with an Excel document attached, entitled "Copy of 2015 Exelon PIP 3 28 16 Final (JBB).xlsx" (the "Excel File"). Thus, Sack forwarded to himself a key document from the Company's system containing a comprehensive overview of the Company's involvement at all of the Exelon sites.

61. In order to hide his actions, Sack subsequently deleted the e-mail from his sent mail folder on the Company's server after sending the e-mail.

62. The Excel File's first tab includes a list of 78 of the Company's most senior managers on the Exelon account, along with detailed information about each of these employees, including salary, "Target PIP," and a number of other employment metrics, as well as internal notes about specific individuals' performance levels.

63.     The Excel File's second tab includes critical employment information for more than 1,500 of the Company's employees working in the Exelon sites spread across numerous states.  The list encompasses nearly 40 fields of information, including employee category, employment location, union member status, salary, gross wages, Medicare benefits and number of vacation days.  In total, the spreadsheet contains almost 60,000 cells of data.

64.     The information in the Excel File is confidential and constitutes trade secrets of APTIM.  The purpose of the second tab, a billing rate approval spreadsheet, is to track the costs APTIM incurs in providing services to Exelon, and these spreadsheets are used to directly calculate the invoices sent to Exelon.  The first tab is compiled from the second tab, and its purpose is to allot bonuses among the employees servicing Exelon.  Not only does it contain the confidential pricing information discussed in the second tab, but it also contains bonus amounts and comments on performance.

65.     The Company took measures to keep this information secret, as it was never disclosed publicly and was only available to a select number of individuals within the Company.  Very few individuals had access to the first tab.  As to the second tab, access to this information on the server was limited to a select number of Company employees, including those in the payroll staff, controllers, certain cost engineers and human resources personnel.

66.     In addition, this information derives its own economic value from not being generally known; among other things, it is the Company's internal information regarding the value of its employees and assessments of job performance.  Thus, APTIM derives independent economic value from this data through maintaining the secrecy of its pricing information.  Should this information be made public, APTIM's competitors would be able to solicit both its employees at slightly higher compensation rates and its clients at slightly lower billing rates,

20

causing APTIM to lose both its employees and clients, as has occurred here. Compromising the confidentiality of this information would cause APTIM economic harm, as competitors would be better able to solicit APTIM's employees. By poaching APTIM's employees, Allied could effectively solicit any Company client by hiring APTIM's key employees on that account who had maintained longstanding relationships with that client and in-depth knowledge of the client's operations and needs.

67.     Considering that Sack sent this information to himself on the same day that he received his employment agreement from Allied and only three days before resigning from the Company, his conduct served no purpose to his then-employer; his intention was to benefit Allied, his new employer. He also intended to benefit BCP, considering at this time Allied was a start-up with no employees or customer contracts. Sack was putting his faith in Jim Bernhard, his former boss and a well-known name in the industry. Sack's conduct was to benefit Bernhard's company BCP because Sack was counting on the resources and connections of BCP, and specifically Bernhard, to make Allied a success.

68.     Sack was not authorized to take this information. At the time Sack sent the confidential Excel File to his personal e-mail account, his allegiance was no longer with the Company. As a result, when Sack e-mailed this information to himself, he acquired these trade secrets by improper means, far in excess of his authorization at the Company, and in violation of the Sack Agreements (as defined below), which he signed when he commenced his employment.

69.     Sack's conduct was also in breach of numerous Company policies. For instance, the Company's Code of Conduct stated that "it is important that [the Company] and its employees fully understand that all documents . . . containing [Company] and/or third party trade secrets are to be kept confidential." Additionally, the Company's Information Technology

Acceptable Use Policy stated: "Users shall not attempt to gain unauthorized access to computer systems or resources, including unauthorized access to confidential information . . . ."

70.     It was inevitable that Sack would disclose this information, as it was exactly the type of information that Allied and BCP needed for their venture to be successful.  There is evident competition between the Company and Allied (including BCP).  It is logical that Sack's role at Allied is similar to the one he held at the Company, making it likely that he would inevitably disclose and rely on the information he misappropriated.  And far from discouraging Sack to use the information, Allied and its funders have benefited from it, successfully entering the industry.  This information continues to be used by Sack, Allied, BCP and Boyle to the detriment of APTIM.  As such, all of these defendants have ratified Sack's conduct.

71.     In the process of Sack stealing the Company's information, as discussed further below, Sack breached the confidentiality and trade secrets agreements he had signed when he commenced employment.  Thus, Allied and BCP—in recruiting and employing Sack— intentionally and unjustifiably interfered with those agreements as well.  They were aware, or should have been aware, that Sack was subject to these types of agreements.  For example, Jim Bernhard, as the former CEO of Shaw, knew that employees such as Sack signed agreements to protect the Company's confidential information.  BCP knew or was on notice due to Bernhard's knowledge.  Allied also knew or was on notice of the Sack Agreements; McCall worked at the Company and must have known that all of his colleagues signed agreements to protect the confidential information of the Company because they are standard in the industry and at the Company.

### C.     Sack Deletes Files

72.     Upon discovering these breaches, the Company was forced to conduct in-depth forensic analyses of Sack's computers and Company e-mail accounts to assess the scope of his actions.

73.     The Company learned through a review of Sack's hardware that on May 30, 2017, the same date as the above-described conduct, Sack deleted (through his Company computer's "Recycle Bin") numerous files.  Accessing and deleting these confidential files betrays Sack's nefarious motive.

74.     For instance, on that day, Sack sent to his Recycle Bin a file entitled "Succession Plan 2016 Exelon Project1.docx," as well as two previous drafts of the same document.  He deleted "Exelon presentation.pptx."  Also deleted were "2017 Plan.xlsx" and "Copy of CBI Time sheet.xlsm."

75.     He additionally deleted files relating to individuals that day, including "Nominees.docx," "Rob Sumler.docx" (Mr. Sumler would soon resign), "Robert Nevin_IC.docx" (who also would soon resign), and "Jeff Bandurski_IC" (who Sack would soon solicit).

76.     Sack also sent to his Recycle Bin that day a significant number of Word documents and PowerPoint presentations relating to another key client of the Company.

## V.     The Conspirators Convince Company Employees to Resign

77.     To ingratiate himself with McCall and BCP, not only did Sack steal APTIM's confidential information, but he was also prepared to solicit as many Company employees as possible.  And he was ready to do this in June 2017, when he (as well as Allied and BCP)

calculated that the Company and its leadership would be focused on other matters—especially the sale of the Capital Services Business.

### A. The Resignations

78. On Friday, June 2, 2017—only three days after he stole the Company's trade secrets and confidential information—Sack resigned. He gave no advance notice; he just left.

79. Sack was in touch with Company employees, recruiting them to join Allied, even before he resigned. For instance, on June 1, the day before he resigned, Plumlee and Sack spoke about conversations that Sack was having with Robert Nevin regarding his job application to Allied.

80. Over the next two weeks, Allied, through their agents Sack and Plumlee, continued targeting as many Company employees as possible, soliciting them to resign and join Allied in its Allied Services branch. In fact, Allied created an excel spreadsheet to track its solicitation of all the senior Company employees on the Exelon account.

81. On the night of June 2, 2017, Sack contacted one of his fellow employees and asked him how quickly he could resign. During this conversation, Sack stated that he was "interested in destabilizing CBI as quickly as possible." The employee rebuffed Sack's efforts, but Sack contacted him again over the course of the next two days. Sack also contacted another employee that Friday and asked him to "look at a web site and consider applying for a job."

82. On Monday, June 5, 2017, Robert Nevin resigned in an e-mail at 6:52 AM, effective at 8:00 AM. Victoria Boyle then resigned in an e-mail at 10:00 AM. At 1:42 PM, Michael Less submitted an e-mail resignation, effective at 2:00 PM. Thomas Dahl resigned in an e-mail at 3:26 PM, and then John Janek resigned in an e-mail at 4:25 PM. Graham Cross and

Bruce Brown resigned that day as well. In total, seven employees—who all serviced Exelon—resigned from the Company on Monday, June 5.

83.     The following morning, on Tuesday, June 6, 2017, David Williams submitted his resignation via e-mail at 8:52 AM, effective as of 3:30 PM. On that night, Sack called another employee, asking him to log on to alliedpwr.com to submit a job application. When that employee asked what the job was, Sack responded that he was "not at liberty to say." Sack texted that employee again the following day.

84.     On June 7, two more employees resigned. Thomas Cardell submitted his resignation via e-mail at 2:31 PM, and Jessica Lee submitted hers via e-mail at 5:41 PM.

85.     On or about June 7, another Company employee who was solicited but did not resign provided a redacted copy of the Allied offer letter to Chris Bethmann, CB&I's Human Resources Manager. The offer letter was from "Allied Power, A Charah Company," and included the website alliedpwr.com and an address of 400 Convention Street, Suite 320, Baton Rouge, LA 70802. The letter began by stating: "Allied Power Services, LLC (the 'Company') is pleased to extend to you an offer of employment to join the Company . . . ." The letter was signed by Plumlee and another former employee of the Company.

86.     Sack continued to solicit the Company's employees. As another employee recalls: "I got about 3 calls a day, mostly from Dean [Sack] wanting me to resign. I said I wouldn't. I was reminded in so many words that management in Allied was taking note of my unwillingness to play ball with them and not showing loyalty."

87.     Four more resignations of Company employees followed: Garry Evans, Michael Myers, Richard Minnick and Rob Sumler. By June 13, fifteen senior individuals at the

Company—directors, managers and specialists—all servicing the Exelon account, had been solicited and enticed to work at Allied.

88.     On June 14, in yet a further effort to interfere with the Company's relationship with its employees and embolden more of them to leave their positions, Allied sent a letter to certain Company employees, stating "you are an at-will employee; and, as such, have the freedom to leave your employment at your discretion to pursue other opportunities." The letter was again signed by Plumlee.

89.     This raid on the senior members of the Exelon team was an organized effort that was surely months in the making—at the behest of BCP. BCP and Allied conspired to steal talented leadership, information, employees and customers from the Company, all the while being fully aware that these actions would cause individuals to violate their contractual obligations and other duties to the Company. Each of the Defendants also acted with full knowledge of APTIM's expectancies under its contract. BCP was aware because of Jim Bernhard's knowledge: Bernhard was the CEO of Shaw at the time the company negotiated the contract with Exelon, and as such, he was fully aware of the Company's expectancy of its employees' continued employment for the account, as well as the integral nature of the Exelon account to the Company. Other BCP partners had also come from Shaw, where they too would have learned of the importance of a contract such as the one with Exelon. The same is true for Allied, which is funded by BCP, and its CEO (McCall) was a former Shaw/CB&I executive who worked with the employees servicing the Exelon account. Finally, Sack (and the other Individual Defendants) obviously had knowledge of these expectancies, as they were key members of the Exelon account.

**B.** **Allied Continued to Interfere with APTIM's Business By Improperly Using Confidential Company Information**

90.     Allied continued to solicit Company employees after the initial resignations. Many of the solicitation activities have been carried out by Victoria Boyle.  Boyle, the former Recruiting Director for the Exelon account, had access to a significant amount of confidential Company information on her personal computer while working at the Company.  After leaving the Company, however, Boyle did not return *any* of that confidential information.  Instead, she continued using the Company's confidential information—which she no longer had any right to possess, let alone use—to recruit Company employees.

91.     For instance, on June 6, 2017, Boyle forwarded the Company file "2017 Billing Rate Approval.xlsx" from her private e-mail account to an Allied employee.  She continued to reference this information and on numerous occasions cited to data in the file.  On June 14, 2017, Boyle e-mailed a confidential Company billing rate table to another Allied employee.  Then, on June 28, 2017, Boyle contacted an APTIM site leader working at one of Major Client 2's sites in New York.  When she asked the employee to come work for Allied, she plainly stated to him his exact hourly rate at APTIM down to the cent (a confidential amount regarding which Allied would have no knowledge).  She has wrongly taken advantage of this confidential Company information, which she improperly misappropriated from the Company and failed to return, on other occasions as well.  Boyle continued to use APTIM's confidential salary information to APTIM's detriment, which Allied and BCP have all ratified by not having prevented her conduct.

92.     Boyle, however, was not alone in continuing to use confidential Company information.  In fact, a number of Allied employees have also stolen confidential and proprietary pricing information, which Allied used to undercut APTIM when soliciting both Company

employees and clients, severely harming APTIM's ability to maintain its existing business relationships.

93.     For example, former Company employee and current Allied employee Jessica Lee converted a significant number of confidential Company documents and an array of other documents, changing *only* the word CB&I to Allied; thus, she created for Allied's benefit an entire collection of documents that copy, verbatim, the Company's documents.  She did this for safety cards and work rules, and most notably for *all* of the Company's policies and procedures developed through significant effort over many years.  In fact, it appears Lee did a simple "control find" search, removing every reference to "CB&I" and replacing it with "Allied."

94.     Robert Nevin supervised and approved of Lee's actions, and he oversaw the conversion of a number of other Company documents, including safety cards.  Additionally, he sent Company policies to Boyle and a client presentation to another Allied employee.

95.     In all, the Defendants misappropriated hundreds of the Company's confidential documents, including operating procedures, manuals, employee handbooks and policies.  Defendants also took a substantial number of other internal Company documents and materials— valuable resources developed by the Company over many years—which transformed Allied from a start-up into a fully functional entity in record time.  Collectively, all of these documents— those that were confidential, as well as those that were valuable internal documents—comprised the core of the Company's business, and they allowed Allied to unfairly compete with APTIM and steal its key customers.

96.     On August 4, 2017, Exelon informed APTIM that it was terminating its relationship with the Company without cause.  Upon information and belief, all or substantially all of that business has been transferred to Allied by an agreement it signed through its entity

Allied Services with Exelon. Since then, APTIM has suffered additional losses, which stem from the improper, unfair and detrimental actions of the Defendants.

97. Upon information and belief, Allied is also attempting to further expand its customer base and has since turned to other important clients of the Company to solicit their business.

**C.     The Individual Defendants Have Breached and Continue to Breach Their Confidentiality Agreements and Company Policies**

98. All of the Individual Defendants are former Company employees, and as such, they signed various documents prohibiting them from wrongfully using the Company's confidential information during employment, or at all after termination of their employment.

99. For example, Sack signed a Confidentiality Agreement, an agreement entitled "Prohibited Use of Confidential Information," a Trade Secrets and Patents Protection Agreement, and an agreement regarding Shaw's Corporate Code of Conduct (collectively the "Sack Agreements").

100. Sack signed the Confidentiality Agreement on December 27, 2006. That agreement clearly sets forth limitations on the disclosure of confidential information:

> 1.     Confidential Information. Unless Employee shall first secure the Company's prior written authorization, Employee shall not disclose or use at any time, either during or subsequent to his employment by the Company, any trade secrets, proprietary technical information or other confidential information (including, without limitation, customer lists, company vision, strategy, methods, systems and procedures, marketing plans and strategies, and other information pertaining to the business of the Company that is not publicly available), whether patented or not, developed and/or owned by the Company or to which the Company has obtained rights by license or otherwise (the "Confidential Information").
>
> For purposes hereof, Confidential Information shall not include (i) information which becomes generally available to the public other than as a result of disclosure by a party who is subject to restriction on dissemination of such information or (ii) information which must be

29

disclosed as a result of legal process, provided that Employee provides prior notice to Company of the requirement of such disclosure.

101.    The Confidentiality Agreement also contains a provision regarding the survival of Sack's obligations after termination of his employment:

>    2.    Survival.  This covenant against use of Confidential Information shall survive termination of the Employee's employment for any reason whatsoever, with or without cause, whether by lapse of time or otherwise, and this covenant shall remain in effect and be enforceable against Employee for so long as such Confidential Information retains commercial value, in the Company's sole opinion. Upon termination of employment, Employee shall promptly deliver to the Company all materials relating to Confidential Information which are in possession of or under the control of Employee, and Employee shall execute such reasonable agreements and/or confirmations of Employee's obligation to the Company concerning nondisclosure of Confidential Information as the Company may require from time to time.

102.    The same form of Confidentiality Agreement was also signed by Boyle on June 2, 2006 and by Nevin on December 20, 2006, and upon information and belief, Plumlee was bound by a similar document as well.  Jessica Lee also electronically signed an "Employee Invention and Confidential Information Agreement" on February 4, 2014 after she was hired.

103.    On December 26, 2006, Sack additionally signed a Trade Secrets and Patents Protection Agreement, which provides, in relevant part:

>    1.    Other than as required in my duties to my Employer, I shall not disclose to anyone or use either during or after my employment, except with written consent of my Employer, any trade secret or confidential technical or business information of my Employer. This same obligation shall apply to trade secrets of any third party as learned by me during my employment and with respect to which my Employer has an obligation to maintain secrecy. Technical business information of any previous employer or other third party which I may disclose to my Employer shall be limited to that which was acquired legitimately and disclosed to me without restriction as to secrecy.

>    * * *

> I have read this Agreement carefully, understand and accept it. It is to be retroactive to date of my first employment by Employer and is in addition to any rights of Employer under any previous similar employment agreement signed by me. My obligations hereunder will continue in the event my employment is transferred from the Company to a Subsidiary or vice versa, or from one Subsidiary to another.

104. Sack also signed a memorandum regarding the Corporate Code of Conduct, under which he agreed to "conduct business in an ethical and legal manner." Upon information and belief, the other Individual Defendants also signed the same or similar agreements.

105. These agreements, as well as all other relevant employee agreements within the Capital Services business segment, were assigned from Shaw to CB&I through Shaw's sale to CB&I in 2013 and then from CB&I to APTIM through APTIM's acquisition in June 2017.

106. All of the Individual Defendants remained bound by these documents after their employment ended, yet all of them continued to use, access and/or disclose the Company's confidential information. As a result, they are all in breach of both their signed agreements with the Company and the Company's policies. APTIM has suffered significant damages as a result of those breaches.

### D. APTIM Is Suffering Irreparable Harm

107. Allied's misappropriation and misuse of APTIM's confidential information is causing APTIM significant harm by gravely injuring its business with its most important customers. Additionally, by using confidential information to steal employees in an industry where human capital and talent are crucial, Allied continues to damage APTIM's ability to pursue additional agreements.

108. Further, the individuals who resigned represented a significant percentage of the leadership and operations management personnel servicing Exelon. Most of these employees had worked for the Company for many years, the Company had invested significant resources

over the years in training them and developing them professionally, and they worked in important roles in the Exelon relationship. They were the core of the Company's relationship with Exelon, working alongside Exelon's employees and within their facilities. Accordingly, their value to the Company was an accumulation of their relationships, capabilities and intricate understandings of the customer relationship, customer operations, and customer needs—which cannot be easily or readily replaced.

109. Now that these employees work for Allied—many in similar if not identical roles vis-a-vis Exelon—it is inevitable that they have disclosed and used, and will continue to disclose and use, elements of APTIM's confidential information which they acquired during their years at the Company. As described above in relation to Sack, these employees were going to a direct competitor of APTIM, which needed their information to solicit clients and compete for work. And all of these employees were offered similar or improved roles at Allied.

110. These events caused the Company to suffer operational disruptions at the Exelon facilities because of a significant number of empty positions at the highest levels in the Exelon facilities.

111. APTIM also had to incur significant costs to quickly seek adequate replacements, especially in the industries in which it works, where no time can be wasted. Immediately after the first wave of departures, the Company began developing and carrying out a strategy to ensure safety at the facilities, retain its employees, and safeguard its business relationship with Exelon. The Company also had to hire an outside vendor, at a substantial and otherwise unnecessary cost, to perform forensic analyses of its systems, computers and e-mail addresses in order to understand what information had been removed from its systems by those who resigned to work at Allied.

112.    Ultimately, as Exelon was the Company's largest customer, APTIM is suffering significant damages as a result of the Defendants' conduct.  If APTIM loses additional business as a result of Defendants' misconduct, the damages will only increase.

### FIRST CLAIM FOR RELIEF
**(Defend Trade Secrets Act)**
**Against All Defendants**

113.    APTIM incorporates all of the above paragraphs by reference.

114.    All of the Defendants have violated the Defend Trade Secrets Act ("DTSA"). APTIM owns and possesses trade secrets and other confidential and proprietary information, including the information stolen by the Individual Defendants, among others.  Further, the Company's employees who resigned and now work for Allied acquired and still retain significant amounts of confidential knowledge and information from when they worked for the Company, all of which was meant to be protected and remain confidential.

115.    The Company took measures to maintain the confidentiality of this information and requires its employees to sign confidentiality agreements.  It also has a significant number of internal policies in place to protect confidential information.

116.    The trade secrets described above were misappropriated and have been used by the Defendants.  Moreover, Defendants' continued use of the trade secrets they misappropriated is all but certain to continue.

117.    The conduct at issue involved interstate commerce, as the trade secrets were obtained by individuals in Illinois and sent to other states, including Louisiana and New York.

118.    If this Court does not enjoin the Defendants, they will continue to misuse APTIM's trade secrets and confidential information to their benefit and to APTIM's detriment.

Due to the highly competitive nature of the industry and the employee poaching tactics of Allied, APTIM has suffered and will continue to suffer irreparable harm.

119.     APTIM has been damaged by the Defendants' conduct, in an amount to be established at trial, and it is entitled to recover for these harms.

**SECOND CLAIM FOR RELIEF**
**(Computer Fraud and Abuse Act)**
**Against Allied Management, Allied Services, BCP, BCP-ESF and Sack**

120.     APTIM incorporates all of the above paragraphs by reference.

121.     Allied, BCP and Sack have violated the Computer Fraud and Abuse Act ("CFAA"). Sack stole confidential information and trade secrets from the Company, which he sent to his personal e-mail account three days before he resigned to join Allied. His acts were intentional and unauthorized. Sack carried out these acts as an agent of Allied and BCP. He additionally deleted a significant number of documents from his computer system and e-mail shortly before resigning.

122.     Allied and BCP are liable for Sack's intentional acts, as they either advised Sack to take such actions and/or ratified his conduct. Allied and BCP both obtained this information because Sack had no other purpose but to share it with them so they could benefit from it.

123.     APTIM has suffered losses in excess of $5,000 since the commencement of this conduct. Among other steps, APTIM had forensic analyses performed on its systems to analyze the information that had been taken. Through this process, it learned that Sack deleted pertinent files from his Company computer account just before he resigned.

**THIRD CLAIM FOR RELIEF**
**(Illinois Trade Secrets Act)**
**Against All Defendants**

124.     APTIM incorporates all of the above paragraphs by reference.

125. All of the Defendants have violated the Illinois Trade Secrets Act ("ITSA"). APTIM owns and possesses trade secrets and other confidential and proprietary information, including the information stolen by the Individual Defendants, among others. Further, the Company's employees who resigned and now work for Allied acquired and still retain significant amounts of confidential knowledge and information from when they worked for the Company, all of which was meant to be protected and remain confidential.

126. The Company took measures to maintain the confidentiality of this information and requires its employees to sign confidentiality agreements. It also has a significant number of internal policies in place to protect confidential information.

127. The trade secrets described above were misappropriated and have been used by the Defendants. Moreover, Defendants' continued use of the trade secrets they misappropriated is all but certain to continue.

128. If the Court does not enjoin the Defendants, they will continue to wrongfully use APTIM's trade secrets and confidential information to their benefit and to APTIM's detriment. Due to the highly competitive nature of the industry and the employee poaching tactics of Allied, APTIM has suffered and will continue to suffer irreparable harm.

129. APTIM has been damaged by the Defendants' conduct, in an amount to be established at trial, and it is entitled to recover for these harms.

### FOURTH CLAIM FOR RELIEF
**(Breach of Fiduciary Duty)**
**Against Sack and Boyle**

130. APTIM incorporates all of the above paragraphs by reference.

35

131.     Sack and Boyle owed fiduciary duties of fidelity and loyalty to the Company, their employer.  Sack breached these fiduciary duties when he began soliciting his fellow employees to work for Allied while he was still employed at the Company.

132.     Sack further breached these duties by exploiting his position with the Company, and knowledge of Exelon's alleged dissatisfaction, to usurp a key corporate opportunity.

133.     Sack and Boyle also breached their fiduciary duties by continuing to use the Company's confidential information and trade secrets to solicit employees after they were no longer employed with the Company.

134.     They are both liable because APTIM has suffered damages as a consequence of their actions.

**FIFTH CLAIM FOR RELIEF**
**(Aiding and Abetting Breach of Fiduciary Duty)**
**Against Allied Management, Allied Services, BCP and BCP-ESF**

135.     APTIM incorporates all of the above paragraphs by reference.

136.     Allied and BCP aided and abetted the breaches of fiduciary duty of Sack and Boyle because Allied and BCP knowingly and substantially assisted Sack's and Boyle's breaches of their fiduciary duties to their former employer.  Allied and BCP must have known that Sack was continuing to solicit the Company's employees while still employed there and separately encouraged them to use the Company's information, after they resigned, to recruit as many of the Company's employees as possible.  By ratifying their agents' conduct, Allied and BCP aided and abetted their breaches of fiduciary duties.

**SIXTH CLAIM FOR RELIEF**
**(Tortious Interference with Business Relations)**
**Against All Defendants**

137.     APTIM incorporates all of the above paragraphs by reference.

36

138.    All of the Defendants tortiously interfered with the Company's business relations, specifically the expectancy that the Company had in relation to its employees.  Each of the Defendants had knowledge of the Company's expectancy, and they all interfered with the Company's expectancy intentionally and unjustifiably.  By Sack and Boyle breaching their fiduciary duties to the Company, Allied and BCP aiding and abetting those breaches, and the Individual Defendants breaching their confidentiality agreements with the Company—all in order to solicit employees for their start-up—the Defendants unjustifiably interfered with the Company's business.  And this unjustified conduct continues, as Allied, with the support of the other Defendants, continues to have access to the Company's confidential information and trade secrets.  APTIM has suffered damages because of the Defendants' tortious interference.

139.    Further, Plumlee, Sack, Allied and BCP tortiously interfered with the Company's business relationship and expectancy with Exelon.  They were aware of the services provided to Exelon by the Company, and their intentional and unjustified acts contributed to the termination of that relationship, from which APTIM has suffered significant damages as a result.

### SEVENTH CLAIM FOR RELIEF
#### (Tortious Interference with Contract)
#### Against Allied Management, Allied Services, BCP and BCP-ESF

140.    APTIM incorporates all of the above paragraphs by reference.

141.    Allied and BCP tortiously interfered with Ron McCall's Employment Agreement and Noncompete Agreement that he signed with Shaw, and which APTIM has the right to enforce.  Additionally, these defendants also tortiously interfered with the Sack Agreements, as well as the contracts of the other Individual Defendants.  They had knowledge of these agreements due to the history between the companies and employees, and they intentionally and

unjustifiably induced breaches of them. The Company has suffered damages as a result of both of these interferences.

142.    APTIM has suffered damages as a consequence of this conduct.

## EIGHTH CLAIM FOR RELIEF
### (Breach of Contract)
### Against the Individual Defendants

143.    APTIM incorporates all of the above paragraphs by reference.

144.    Defendants Sack, Boyle, Nevin, Plumlee and Lee all signed valid confidentiality agreements that prevented them from disclosing the Company's confidential information.

145.    The Individual Defendants breached these agreements by disclosing the Company's confidential information to Allied, BCP and each other.

146.    APTIM has suffered significant damages as a consequence of these breaches.

## NINTH CLAIM FOR RELIEF
### (Unfair Competition)
### Against All Defendants

147.    APTIM incorporates all of the above paragraphs by reference.

148.    All of the Defendants were involved in an organized effort to improperly strip APTIM of its key employees on the Exelon account. The Defendants sought to destabilize the Company, by poaching its key employees who serviced Exelon and then encouraging those individuals to solicit others to join Allied. The Defendants then improperly took and used a significant volume of the Company's documents and resources (which took years to develop), allowing Allied to appear as a fully functional company long before it otherwise would have been up and running.

149.    The actions taken by the Defendants were improper and against industry standard, and thus constitute unfair competition. APTIM has suffered damages as a result.

## TENTH CLAIM FOR RELIEF
### (Unjust Enrichment)
### Against Allied Management, Allied Services, BCP and BCP-ESF

150.    APTIM incorporates all of the above paragraphs by reference.

151.    Allied and BCP, as a result of their tortious conduct—including the improper solicitation of the Company's workforce and clients, as well as taking and using massive amounts of the Company's documents and resources—have retained significant benefits, to APTIM's detriment.  These benefits, because they were received improperly, violate the fundamental principles of justice, equity and good conscience.  Therefore, APTIM has the right to be made whole by the amount that the Defendants have been unjustly enriched.

## ELEVENTH CLAIM FOR RELIEF
### (Civil Conspiracy)
### Against All Defendants

152.    APTIM incorporates all of the above paragraphs by reference.

153.    All Defendants conspired to acquire trade secrets.  The Individual Defendants acted in furtherance of that conspiracy, and they did so in violation of the DTSA and (as to Sack) the CFAA.  Boyle appears to still be acting on that information.

154.    Further, all Defendants conspired to poach as many employees from the Company as possible; enable Sack to usurp the Company's corporate opportunities; and interfere with its business relationship with Exelon.  The Individual Defendants acted in furtherance of this conspiracy, while tortiously interfering with the Company's expectancies.

155.    APTIM has suffered significant damages because of the Defendants' concerted conspiracy.

## PRAYER FOR RELIEF

WHEREFORE, APTIM prays for the following relief:

A.     Preliminary and permanent injunctive relief;

B.     Damages in an amount to be further proven at trial;

C.     Punitive damages, exemplary damages, and other amounts permitted by law;

D.     Restitution;

E.     Attorneys' fees and costs; and

F.     All such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury for all causes of action and claims in this action that are triable by right to a jury.

DATED:  April 9, 2018                                 Respectfully submitted,

                                                     SKADDEN, ARPS, SLATE,
                                                         MEAGHER & FLOM LLP

                                                     /s/ Eric J. Gorman
                                                     Patrick Fitzgerald
                                                     Eric J. Gorman
                                                     155 North Wacker Drive
                                                     Chicago, IL 60606
                                                     Telephone: (312) 407-0700
                                                     E-mail: patrick.fitzgerald@skadden.com
                                                             eric.gorman@skadden.com


                                                     Lauren E. Aguiar (admitted *pro hac vice*)
                                                     David E. Schwartz (admitted *pro hac vice*)
                                                     Four Times Square
                                                     New York, NY 10036
                                                     Telephone: (212) 735-3000
                                                     E-mail: lauren.aguiar@skadden.com
                                                             david.schwartz@skadden.com

                                                     *Counsel for Plaintiff Aptim Corp.*

## <u>CERTIFICATE OF SERVICE</u>

Undersigned counsel hereby certifies that on April 19, 2018, copies of the foregoing

filing, *Plaintiff Aptim Corp.'s Second Amended Complaint*, were served on the following counsel

of record through the CM/ECF system of the United States District Court for the Northern

District of Illinois:

Robert B. Ellis
Nicholas F. Wasdin
Michael S. Biehl
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654

Kimberly Branscome
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, CA 90071

*Counsel for Defendants Allied Power
Management LLC and Bernhard
Capital Partners Management LP*

Ronald S. Safer
Kelly M. Warner
Eli J. Litoff
RILEY SAFER HOLMES
   & CANCILA LLP
Three First National Plaza
70 West Madison Street
Chicago, IL 60602

*Counsel for Defendants
Sack and Boyle*

/s/ Eric J. Gorman
Eric J. Gorman